# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:17-cr-431-SI |
| v. | **OPINION AND ORDER** |
| **DAT QUOC DO**, | **ON MOTION TO SUPPRESS** |
| Defendant. | |

Billy J. Williams, United States Attorney, and Benjamin Tolkoff and Paul Maloney, Assistant United States Attorneys, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Gerald M. Needham and Elizabeth G. Daily, Assistant Federal Public Defenders, OFFICE OF THE FEDERAL PUBLIC DEFENDER, 101 SW Main Street, Suite 1700, Portland, OR 97204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Defendant Dat Quoc Do ("Do") is a native Vietnamese speaker with a limited ability to speak and understand the English language. He is charged with two counts of unlawful use of a weapon and two counts of carrying and using a firearm during a crime of violence. All relevant conduct occurred on the Warm Springs Indian Reservation. After law enforcement officers placed Defendant in custody, the officers verbally advised Defendant of his *Miranda* rights in English. Based on Defendant's verbal responses, also in English, the officers concluded that

PAGE 1 – OPINION AND ORDER

Defendant understood his rights and waived them. Defendant then gave a video-recorded statement to the officers while Defendant was seated in the back seat of a police cruiser. Later that evening, Defendant was again interviewed, this time by a tribal detective and a Special Agent of the FBI. These law enforcement officers also verbally advised Defendant of his *Miranda* rights in English. Based on Defendant's verbal responses, also in English, these law enforcement officers similarly concluded that Defendant understood his rights and waived them. Defendant then gave a video-recorded statement, his second of the evening, to the detective and the FBI agent. Defendant moves to suppress both of these statements, arguing that his limited knowledge of English impaired his ability knowingly and voluntarily to waive his rights, thereby rendering his verbal waivers ineffective.

## BACKGROUND

As alleged by the Government, on September 4, 2017, at about 10:30 p.m., Do was a passenger in a Honda Accord driving eastbound on Highway 26, heading toward Madras, Oregon. Do's girlfriend, Thao Bich Tran ("Tran") was driving. As Tran drove through the Warm Springs Indian Reservation, a Ford Focus, also driving eastbound on Highway 26, was in front of Tran's Honda. As Tran's Honda passed the Ford, Do pointed a handgun out the window of the Honda and fired several shots. Whether Do fired when he was behind the Ford, beside the Ford, or in front of the Ford, how many shots he fired, in what direction he fired, and why he fired the gun are all questions the answers to which are disputed by the parties. None of these answers, however, is relevant to the pending motion to suppress Defendant's statements.

After shots were fired, the police were called, and the police pulled over the Honda. Do and Tran were placed in the backseat of a police car, and their conversation in the police car was recorded. They spoke to each other in Vietnamese. A short time later, while Do was still in the backseat of the police car, a police officer verbally advised Do of his *Miranda* rights in English,

PAGE 2 – OPINION AND ORDER

after which Do answered the officer's questions in broken English, which also was video-recorded. Do moves to suppress the statement that he gave to the officer while in the police car. Do does not move to suppress the recorded conversation between Do and Tran.

At some point that evening, Do was arrested. Shortly thereafter, he was again interviewed, this time by a detective with the Warm Springs Police and a Special Agent of the FBI. Do was again verbally advised of his *Miranda* rights in English, and he answered questions by the detective and the FBI Agent in broken English. This statement also was video-recorded. Do moves also to suppress his statements to the detective and FBI agent.

Do was born in Viet Nam and is a native Vietnamese-speaker. At the time of his arrest, Do had been in the United States for seven years and appears, from the video record of the statements he made, to have a basic knowledge of spoken English. Also based on the recording, Do appears to be intelligent and without any noticeable cognitive impairment. Do, however, argues that because of his difficulties with the English language he did not knowingly waive his *Miranda* rights and, accordingly, his statements made to law enforcement officers in the police car and in the police station should be suppressed.

## DISCUSSION

### A. Standards

"For inculpatory statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's waiver of *Miranda* rights must be voluntary, knowing, and intelligent." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (quotation marks omitted). When deciding whether a defendant knowingly waived his or her *Miranda* rights, a court considers "the totality of the circumstances including the background, experience, and conduct of defendant." *Id.* (quoting *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). The prosecution must prove "by a preponderance of the evidence that a defendant

PAGE 3 – OPINION AND ORDER

knowingly and intelligently waived his *Miranda* rights," and there is a presumption against waiver. *Id.* To satisfy its burden of proving waiver, the government "must introduce sufficient evidence to establish that under the totality of the circumstances, the defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quotation marks omitted). "The government's burden to make such a showing is great, and the court will indulge every reasonable presumption against waiver of fundamental constitutional rights." *Id.* at 537 (quotations marked omitted). One factor a court should consider "[i]n determining whether a defendant knowingly and intelligently waived his *Miranda* rights" is "any language difficulties encountered by the defendant during custodial interrogation." *Id.*

In *Garibay*, law enforcement officers conducted a custodial interrogation in English of the defendant, whose primary language was Spanish. The officers, however, did not offer the defendant the option of conducting the interrogation in Spanish (and the defendant did not decline such an offer). Instead, the interrogating officer "questioned Garibay in English and assumed that Garibay was sufficiently proficient in English to understand and waive his *Miranda* rights without the assistance of a Spanish-speaking officer." *Id.* (footnote omitted). The agent, however, admitted "that he had to rephrase questions when Garibay did not seem to comprehend what was said to him. Although Spanish-speaking agents were available at the time of Garibay's arrest and custodial interrogation, [the agent] did not enlist those agents to assist him in questioning Garibay." *Id.*

After an evidentiary hearing, the district court in *Garibay* found that the defendant's waiver of his *Miranda* rights was knowing and intelligent, and the district court denied Garibay's motion to suppress. Garibay then proceeded to a jury trial and was convicted on charges of importing marijuana and possession of marijuana with intent to distribute.

On appeal, the Ninth Circuit stated:

> A defendant's mental capacity directly bears upon the question
> whether he understood the meaning of his *Miranda* rights and the
> significance of waiving his constitutional rights. It is undisputed
> that Garibay's IQ is borderline retarded and that he has difficulty
> understanding the English language. Additionally, the pre-sentence
> report confirmed Garibay's inability to understand oral
> instructions. Without these skills, Garibay could not have
> knowingly and intelligently waived his rights. The government
> presented no evidence to contradict the fact that Garibay, in
> addition to being limited-English proficient, is borderline retarded
> with extremely low verbal-English comprehension skills.

*Id*. at 538 (citations and footnotes omitted). The Ninth Circuit explained:

> In applying the "totality of circumstances" test, we further examine
> whether other circumstances surrounding Garibay's interrogation
> indicate that he knowingly and intelligently waived his
> constitutional rights, despite his English-language difficulties,
> borderline retarded IQ, and poor verbal comprehension skills. The
> following considerations guide our inquiry: (1) whether the
> defendant signed a written waiver; (2) whether the defendant was
> advised of his rights in his native tongue; (3) whether the
> defendant appeared to understand his rights; (4) whether a
> defendant had the assistance of a translator; (5) whether the
> defendant's rights were individually and repeatedly explained to
> him; and (6) whether the defendant had prior experience with the
> criminal justice system.

*Id*. (citations omitted). After finding that "none of these considerations are present," *id*., the

Ninth Circuit reversed the district court's judgment and remanded for a new trial.

In *Garibay*, the Ninth Circuit concluded:

> The requirement that a defendant knowingly and intelligently
> waive his *Miranda* rights implies a rational choice based upon
> some appreciation of the consequences of the decision. . . .
>
> We are troubled by the circumstances surrounding Garibay's
> alleged waiver. It is hard for us to discern any justification for the
> agents' failure to ask Garibay whether he preferred Spanish or
> English and their failure to seek the assistance of bilingual agents
> in questioning Garibay. The agents' oversight is particularly
> glaring given that Garibay's primary language is Spanish, that
> Garibay was arrested at the U.S.-Mexico border, that [the agent]

had to rephrase several questions in English in an attempt to communicate with Garibay, and that bilingual agents were readily available. . . . The right to remain silent and the right to have counsel present during questioning are indispensable to the protection of the Fifth Amendment privilege against self-incrimination. Written waivers coupled with oral recitations help ensure that the necessary procedures are in place to protect such constitutional rights which all officials are sworn to uphold. In the circumstances of Garibay's custodial interrogation, we find that the steps taken to protect these essential rights were deficient.

*Id*. at 540 (citations and quotation marks omitted).

## B. Application

The Court has reviewed both video-taped interrogations of Do and also the police car's "dashcam" video of Do receiving and generally complying with directions from the police officers. The Court specifically observed the two sets of *Miranda* warnings verbally given to Do in English and his responses. The Court also received testimony at an evidentiary hearing from Tran about Do's limited understanding of, and proficiency in, English. The Court also notes that Tran stated that Do is the father of Tran's young child. Do's motion to suppress presents circumstances that are less egregious than were found by the Ninth Circuit in *Garibay*, but still more problematic than are present in many cases involving custodial interrogations in which there is no evidence that a defendant had any difficulty understanding the English language.

After Do and Tran were placed together in the back of a police car, an officer read them their *Miranda* rights in English. The officer asked Do whether he understood his rights. Do responded, "Give me one second." The officer asked again, and Do said, "A little bit." The officer asked, "A little bit?" and Do replied, "Yeah." The officer asked, "What do you mean a little bit?" Do's response was: "And I am . . . I uh." Trans then interjected, telling the officer, "He don't understand English that much." Do then said: "I don't understand a lot but . . . so a little bit." The officer then asked, "Okay, uhm . . . do you understand what I am saying to you

though?" Do replied, "Yeah." After the officer said "okay," Do added: "Yeah, I understand. I'm with you." The officer said, "Okay. And we see you don't unders—you said you didn't understand English very well?" Do responded, "I might not understand, not well but uh—just a little bit." Do also told the officer, "Some easy I can understand."

A short while later, Do said to the officer: "How about I give you $200 then you release me?" Many of Do's responses to the officers, however, were short, typically "um" or "yeah." At one point the officer asked Do, "Would it help if there was like a translator maybe." Do replied, "um." The officer later asked Do and Tran what happened. The officer asked Tran, "He shot the gun out the window?" and Tran said "Yeah." Do interjected, "Yeah, I shot the gun and—on, up in the air." A little later, the officer asked Do whether he was trying to scare the people in the other car. Do responded, "Something like that. Like just tell him like don't do that with me, you know. I don't want like somebody to like throw away a bottle at my car again, or something. He tried to brake on my front car couple times."

The officer also stated, possibly to another officer, "So, he has a really hard time understanding English, and so I asked him, when you put the gun out the window, were you trying to scare them, and he said something like that, like it has to be very—very simple, so my question is would it be worth, do we have a translator of some sort type of?" After additional questioning in English, the officers arrested Do and brought him to the police station.

At the police station, a detective and an FBI agent spoke with Do. *See* ECF 53-1 (transcript). The detective asked Do, "Do you understand what I'm saying to you? Do replied, "Just a little bit, because I cannot understand a lot with—In this. So you—so." Do then added:

> MR. DO:     So I got question. So can—*so can I have a translate—somebody translate for me*? It's easy, because I—I understand well. And when you talk, I easily understand. Sometime I don't understand. So if my girlfriend still here, she,

like (indiscernible)—she live here long time, so she understand a
lot. So she can translate for me. Can I do that?

ECF 53-1 at Tr. 4:2-9 (emphasis added). The detective then explained to Do that Tran had left.

The detective said that he would go slowly and advise Do of his rights. The detective read Do his

rights slowly, pausing after each statement. Do often responded with "Okay" or "Yeah." After

the detective told Do, "Now, if you don't understand any of this, you—you tell me." Do replied,

"Okay. Now, I mean, like, you—you tell (indiscernible) and I understand, and like, now, at this

time, I would answer the question without a lawyer (indiscernible) here. So I—". The detective

responded, "Do you want to talk to us?" Do replied, "Yeah. Okay. I want to talk." The detective

added that Do "can stop talking, if you wish." Do responded, "Because, like, I—I only—when I

speak not well, so if mess up something, like, even have my lawyer in here is easy, you know. So

this is important, for the questions, or something?" Shortly thereafter, however, Do asked why he

*had* to answer the questions. Specifically, Do asked:

> MR. DO:      Mm-hum. Yeah. *So why do I have to, like, answer
> the questions right now, and—and in the car, different*? I mean,
> like, I answer the questions for you right now. And what the
> questions in the car, it different, like why it different, like, in here
> and in car?
>
> SPECIAL AGENT SMITH:   I don't understand what he's saying.
>
> MR. DO:      Oh, sorry.

ECF 53-1 at Tr. 9:25-10:9 (emphasis added). The detective also asked Do whether he understood

that he could stop talking at any time, and Do responded, "Okay." After the detective asked

whether "you're willing to talk to us without a lawyer present?" Do said, "So if I don't want to

talk anymore, I just stop and wait for my lawyer?" The detective said, "That's correct." Do then

proceeded to make a statement, again in broken English. Among other things, Do explained that

his Uncle has "cosigned" for the car he was in and that Do had asked someone in a gun store

whether he needed a "license permit" to carry a gun and the clerk explained to Do, "In Oregon law, so you can carry the gun, but you can (indiscernible) somebody saw it." At the end of the interview, the FBI agent said to Do, "Thanks for speaking with us." Do replied, "You are welcome."

Do appears to have understood a fair amount of what the several law enforcement officers were explaining to him and, for the most part, to have made himself somewhat understandable to them. Only one, or at most two, of the six *Garibay* factors, however, appears to have been satisfied. Do did not sign a written waiver (in English or Vietnamese), he was not advised of his rights in his native tongue (Vietnamese), he did not have the assistance of a translator (even though he had asked for one), and he does not appear to have had prior experience with the criminal justice system (at least, not that the Government has presented). On the other hand, Do's rights were individually and repeatedly explained to him. In addition, when asked whether he understood his rights, Do generally responded with "Yeah" or "Okay." He also stated on several occasions that he understood that he could stop talking, but on another occasion he asked why he "had" to answer the officers' questions again. The *Garibay* factors should not be applied rigidly; they are only considerations that go into the mix of the "totality of the circumstances."

Further, the relevant standard is merely a preponderance of the evidence, which means more likely than not. It is difficult, however, to reconcile the applicable preponderance standard, as stated in *Garibay* and numerous other cases, with the other statements in *Garibay* that the Government's burden of showing that a defendant was aware of the nature of the right being abandoned and the consequences of the decision to abandon that right is "great" and that the court should "indulge every reasonable presumption against waiver of fundamental constitutional

rights." *Garibay*, 143 F.3d at 537 (quoting *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984). Because a court should not lightly find a waiver of the fundamental constitutional right to remain silent, the Court in this case cannot conclude based on the evidence presented that Do knowingly and voluntarily waived that right.[1]

## CONCLUSION

Defendant's Motion to Suppress Statements (ECF 53) is GRANTED. The statements that Defendant gave to the police officers while in the backseat of a police car and to the detective and FBI Special Agent while in the police station, during his custodial interrogations on September 4 and 5, 2017, may not be used by the Government in its case-in-chief. Defendant's statements, however, may be used by the Government to impeach Defendant's credibility if he testifies at trial inconsistently with those statements. Further, nothing in this Order precludes the Government from using the recorded statements made between Defendant and Tran on September 4, 2017, while they were both seated in the back of the police car. Similarly, nothing in this Order precludes the Government from using the guns, ammunition, and shell casings found in the car in which Defendant was riding when shots were fired from that car.

**IT IS SO ORDERED**.

DATED this 29th day of November, 2018.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

---

[1] The Court, therefore, need not reach the other questions raised by Do regarding whether he knowingly and voluntarily waived his right to have counsel present during questioning and whether he unequivocally requested the assistance of counsel.